J-S10030-15

2015 PA Super 80

| ADOPTION OF: C.J.P., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.B.P., MOTHER | No. 2650 EDA 2014 |

Appeal from the Decree entered July 22, 2014,
in the Court of Common Pleas of Delaware County,
Orphans' Court, at No: 0036-2013

BEFORE: GANTMAN, P.J., STABILE, and PLATT,* JJ.

OPINION BY STABILE, J.:                                      **FILED APRIL 15, 2015**

J.B.P. (Mother) appeals from the decree entered July 22, 2014, in the

Court of Common Pleas of Delaware County, which involuntarily terminated

her parental rights to her minor son, C.J.P. (Child), born in May of 2011. We

affirm.[1]

On July 19, 2011, protective custody of Child was awarded to Children

and Youth Services of Delaware County (CYS), as a result of Mother's

homelessness and mental instability. Child has remained in foster care since

that time. On April 9, 2013, CYS filed a petition to involuntarily terminate

Mother's parental rights to Child, and a termination hearing was held on July

18, 2014.

At the beginning of the termination hearing, Mother's court-appointed

trial counsel stipulated to the admission of CYS Exhibit 1 into evidence.

---

* Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court entered a decree terminating the parental rights of
Child's unknown father that same day. Child's father is not a party to the
instant appeal.

N.T., 7/18/14, at 4-5. CYS Exhibit 1 consisted of, *inter alia*, a court summary prepared by CYS, therapy progress notes, a series of mental health evaluations, various parenting and visitation progress reports, and a number of documents related to a criminal charge against Mother.[2] Additionally, Mother's counsel stipulated that the evidence presented at Mother's June 12, 2013 goal change hearing would be incorporated by reference.[3] *Id.* at 4-5. CYS did not present any live testimony at the July 18, 2014 hearing. Mother testified on her own behalf, and neither counsel for CYS nor Child's guardian *ad litem* cross-examined Mother.

On July 22, 2014, the orphans' court entered its decree involuntarily terminating Mother's parental rights to Child. On July 29, 2014, Mother's trial counsel filed a petition to withdraw his representation. By order entered August 5, 2014, the court vacated the appointment of Mother's trial counsel and appointed Mother's current counsel. Mother timely filed a notice of appeal on August 15, 2014. However, Mother did not concomitantly file a concise statement of errors complained of on appeal, as required by Pa.R.A.P. 1925(a)(2)(i). On September 25, 2014, this Court ordered Mother

---

[2] These documents, which are contained in the certified record, are labeled as individual exhibits. However, they were admitted simultaneously as one exhibit with eight "attachments." N.T., 7/18/14, at 4-5.

[3] At the conclusion of the June 12, 2013 goal change hearing, the court denied the requested goal change to adoption to give Mother one final chance to change her ways. N.T., 6/12/13, at 72.

to file a concise statement by October 6, 2014. Mother complied by filing a

concise statement with the orphans' court on that date.[4]

Mother now raises the following issues for our review.

I. The [orphans' c]ourt erred in ordering termination of parental rights of [M]other there being the lack of clear and convincing evidence to support the [orphans' c]ourt's conclusion thereof.

II. CYS failed to extend reasonable good faith services to [M]other to promote family stability and preserve family unity to warrant termination of parental rights.

III. [Mother] challenges the constitutionality and fairness of 23 Pa.C.S.A. [§] 2511(b) in violation of the equal protection clause and due process clauses of the United States and Pa. Constitution.

Mother's Brief at 5.

We consider Mother's claims mindful of our well-settled standard of

review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest

---

[4] Neither CYS nor Child's guardian *ad litem* has objected or claimed any prejudice as a result of Mother's failure to file a concise statement until ordered to do so by this Court. Thus, we have accepted Mother's statement in reliance on our decision in **In re K.T.E.L.**, 983 A.2d 745, 748 (Pa. Super. 2009) (holding that a mother's failure to comply strictly with Pa.R.A.P. 1925(a)(2)(i) did not warrant waiver of her claims, as there was no prejudice to any party). **Cf. J.M.R. v. J.M.**, 1 A.3d 902, 906-07 (Pa. Super. 2010) (holding that a father had waived his claims on appeal after this Court ordered him to file a concise statement, and the father's statement was untimely).

unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.  One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8) and (b).  We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm.  *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Here, we analyze the court's decision to terminate under Sections 2511(a)(8) and (b), which provide as follows.

> **(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a) … (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003). "Notably, termination under Section 2511(a)(8), does not require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006) (citations omitted).

Instantly, the orphans' court concluded that Mother's parental rights should be terminated because of her unwillingness or inability to address her mental health issues. Orphans' Court Opinion, 9/18/14, at 8-9, 12-15 (unpaginated). The court also emphasized Mother's lack of stable housing, her resentment and hostility towards others, and her "refusal to cooperate (or even communicate) with CYS . . . ." *Id.* at 9, 14.

In response, Mother presents a wide variety of arguments. Mother contends that the orphans' court abused its discretion by relying solely on a psychiatric evaluation produced by Dr. Stephen Mechanick in January and February of 2013, which recommended that Child's permanency goal should be changed to adoption, and by disregarding a psychological evaluation produced by Dr. Karen Dybner-Madero in May of 2012, which was less critical of Mother, but which did not directly address whether Child's goal should be changed. Mother's Brief at 8. Mother then blames her CYS caseworker for not being sufficiently supportive and accepting of her, contends that it was the caseworker's lack of support that resulted in Mother's lack of contact with CYS, and asserts that CYS should have

assigned her a new caseworker. *Id.* at 9. Mother argues that she did well during her visits with Child, and that she improved her parenting skills. *Id.* at 9-10, 12. Mother also states that she is seeking employment, and that she has made, and continues to make, progress toward improving her mental health and other aspects of her life. *Id.* at 10-12. Finally, Mother argues that the court failed to consider her individual circumstances, such as her history of being sexually abused, and placed a "sole and undue emphasis on her mental health issues to the exclusion of all else and without relating it to her true ability to parent which was positively documented in other areas by other service providers." *Id.* at 13-14.

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Mother's parental rights to Child. During the June 12, 2013 goal change hearing, CYS caseworker, LaKisha Smith, testified that she had been working on Mother's case since August of 2011. N.T., 6/12/13, at 4. Ms. Smith noted that Child was adjudicated dependent as a result of Mother's mental health issues and unstable housing. *Id.* at 5. Ms. Smith conceded that Mother visited regularly with Child since that time, and that Mother had obtained housing. *Id.* at 7. However, Ms. Smith testified that Mother was discharged from therapy at Northwestern Human Services and placed on a waiting list in March of 2013. *Id.* at 8. According to Ms. Smith, this was because Mother was volatile and engaged in "angry outbursts" during

therapy, and "many therapists have refused to continue to work with [Mother]." *Id.* Ms. Smith also noted that Mother "refuses to have contact with me."[5] *Id.* at 11.

Dr. Steven Mechanick testified that he is a physician specializing in the practice of psychiatry, and that he prepared a psychiatric evaluation of Mother. *Id.* at 15-16. Dr. Mechanick explained that he diagnosed Mother with "a depressive disorder not otherwise specified[,]" as well as "a personality disorder not otherwise specified with paranoid and borderline features." *Id.* at 19. Dr. Mechanick opined that Mother's depressive disorder would have little impact on her ability to act as a parent, and that Mother "might improve." *Id.* at 20, 23. However, Dr. Mechanick expressed greater concern with respect to Mother's personality disorder. *Id.* Dr. Mechanick testified that Mother's personality issues "are pervasive" and have limited her ability to "take care of herself in some of the normal, broader functional areas of life[,]" and "to function in the world." *Id.* at 20-22. Dr. Mechanick further explained that individuals with similar personality disorders typically need "quite a number of years" before they are able to improve, if they ever improve at all. *Id.* at 23, 33. Dr. Mechanick noted that Mother is "not particularly insightful or motivated to change her own

_____

[5] In the court summary submitted at the July 18, 2014 termination hearing, Ms. Smith opined that Child is "extremely bonded" to his foster parents, that removing Child from his current foster placement would be "extremely detrimental" to him, and that Mother's parental rights should be terminated. CYS Exhibit 1, at 17-18.

sort of world view or patterns of behavior," and that this "would worsen her prognosis." *Id.* at 23. Dr. Mechanick acknowledged that Mother likely experiences heightened stress as a result of her interactions with CYS, but opined that this stress was not the primary cause of her mental condition.[6] *Id.* at 26-27.

Clinical visitation worker Kenya Cobb testified that she had been conducting biweekly supervised visits with Mother since 2012, and that Mother began receiving unsupervised visits at her home in April of 2013. *Id.* at 37. Ms. Cobb testified that Mother had been doing well during visits, but that "I just had mainly concerns with mom when she becomes upset. We've had to . . . talk her down through a few of the visits." *Id.* at 38. Ms. Cobb further explained that Mother "has done okay caring for [Child] with short periods of time," but that she was concerned that Mother would be unable to care for Child full-time, as a result of her mental health issues. *Id.* at 39.

Finally, Mother testified that she did not want to have any contact with CYS because "they're really negative. They keep just being mean to me about my mental health, [and] my past history." *Id.* at 49-50. Mother stated that she asked for a different caseworker, but that CYS declined to

---

[6] In Dr. Mechanick's evaluation, which was admitted into evidence at the July 18, 2014 termination hearing, he concluded that "[i]t may take many years for [Mother] to reach a level of emotional stability and improved functioning so that she could adequately care for [Child,]" and that a goal change to adoption "is reasonable and appropriate." CYS Exhibit 5, at 10.

provide her one. *Id.* at 50. Mother refused to go back to therapy and explained that "I just can't" attend therapy, because "I can't talk about my past." *Id.* at 53-54, 59. Mother also testified that she had been living in an apartment since March 1, 2013. *Id.* at 60. However, Mother admitted that this was the third location where she had been residing since January of 2013. *Id.* at 60-62.

During the termination hearing on July 18, 2014, Mother further testified concerning her efforts at reunification following the June 12, 2013 goal change hearing. Mother explained that she was incarcerated shortly after the goal change hearing, and lost her apartment. N.T., 7/18/14, at 15, 19. Mother stated that she was released on "August 26 or 27 of 2013," and that she is currently on parole. *Id.* at 19-20. Mother indicated that she was homeless at the time of her release, but that she would be moving into a new residence on September 1, 2014. *Id.* at 21, 27-28. Mother claimed that she attends counseling and sees a doctor for psychiatric medication. *Id.* at 29-32. Mother also claimed that she was trying to comply with CYS "little-by-little" but that she could not do everything that had been asked of her. *Id.* at 40. For example, Mother admitted that she was not meeting regularly with CYS and keeping them advised of her location. *Id.*

Concerning her relationship with Child, Mother testified that she was initially unable to visit with him after her release from incarceration because she lacked transportation. *Id.* at 22-23. Mother stated that she was again

able to visit with Child at the hospital "in the middle of October/November" of 2013. *Id.* at 23. Mother stated that she met with Child's foster mother at the hospital, and that she also had telephone conversations with the foster mother about Child. *Id.* at 23-24. Mother acknowledged that Child is "attached" to his foster mother, and that, when she visited with Child in the hospital, "he didn't really want to be near me because he ain't seen me in a while," and "it took him a while in the hospital to be attached to me." *Id.* at 24. Mother noted that she now visits with Child once every two weeks. *Id.* at 41. Mother testified that her visits with Child go well, and that they talk and play together. *Id.* at 44. Mother explained that she did not want to remove Child from the care of his foster mother, who was taking good care of Child. *Id.* at 26. However, Mother stated that she would not give up her rights to Child voluntarily, and that she wanted Child back. *Id.* at 25. Mother reported that Child had stated to her that he "wants to be with [his foster mother] and he wants to be with me." *Id.* at 45.

Accordingly, the record confirms that Child had been out of Mother's care for a period in excess of 12 months at the time CYS filed its termination petition on April 9, 2013, and that the conditions that led to Child's placement continued to exist, as Mother had failed to remedy her mental health issues and find stable housing. Most critically, the evidence establishes that Mother was discharged unsuccessfully from therapy in March of 2013 and that, at the time of the goal change hearing, she had no

intention of returning. While Mother testified during the termination hearing that she is now attending counseling and is making more of an effort to comply with CYS, these remedial efforts took place after CYS filed its petition to terminate her parental rights. Mother does not dispute that she received notice of the termination petition at the time it was filed in April of 2013 and, therefore, the orphans' court was not permitted to consider these efforts. **See** 23 Pa.C.S.A. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."). Moreover, while Mother contends that the court placed undue emphasis on Dr. Mechanick's psychiatric evaluation, we observe that the orphans' court was free to weigh the evidence presented during the termination proceedings as it saw fit. **See T.S.M.**, 71 A.3d at 267.

Additionally, the record confirms that terminating Mother's parental rights would best serve the needs and welfare of Child. At the termination hearing, Mother acknowledged that Child is "attached" to his foster mother, and that the foster mother has been taking good care of Child. In contrast, Mother has not cared for Child since July of 2011, when he was about two months old. At the time of her termination hearing, Mother had failed for a period of nearly three years to remedy her problems, and the evidence suggests that Mother is unlikely to achieve recovery anytime soon. It would

not serve Child's needs and welfare to place his life on hold any longer. **See M.E.P.**, 825 A.2d at 1276 ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting."). No relief is due.[7]

Next, we consider whether termination was proper under Section 2511(b). Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010). As this Court has explained, "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered" as part of our analysis. **In re K.K.R.-S.**, 958 A.2d 529, 533 (Pa. Super. 2008). "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." **In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011) (citing **K.K.R.-S.**, 958 A.2d at 533-36).

---

[7] In her brief, Mother also asserts that the orphans' court erroneously considered certain irrelevant evidence. Mother's Brief at 13. We observe that Mother did not include this claim in her concise statement of errors complained of on appeal. Thus, it is waived. **See Krebs v. United Refining Co. of Pa.**, 893 A.2d 776, 797 (Pa. Super. 2006) ("[A]ny issue not raised in a statement of matters complained of on appeal is deemed waived.") (citations omitted).

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*Id.* (quoting *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010)); *see also In re T.D.*, 949 A.2d 910, 920-23 (Pa. Super. 2008), *appeal denied*, 970 A.2d 1148 (Pa. 2009) (affirming the termination of parental rights where "obvious emotional ties exist between T.D. and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of parenthood," and where preserving Parents' rights would prevent T.D. from being adopted and attaining permanency).

Here, the orphans' court found that Child was bonded with his foster mother, and that removing Child from his current placement would be detrimental to him. Orphans' Court Opinion, 9/18/14, at 15, 17. In contrast, the court concluded that Child has "only a very modest connection" with Mother, and that it would be in Child's best interest for Mother's parental rights to be terminated. *Id.* at 17. Mother argues that the orphans' court failed to conduct an adequate analysis of Mother's bond with Child, that her bond with Child is "significant," and that the court lacked sufficient evidence from which to conclude that termination was in Child's best interest. Mother's Brief at 14. Mother emphasizes that she visited regularly with Child, that she did well during her visits, and that visitation

progress reports contained in CYS Exhibit 1 confirm that she and Child are bonded. *Id.* at 14-15.

Again, we conclude that the orphans' court did not abuse its discretion. As noted during our discussion of Section 2511(a)(8), it is undisputed that Child is bonded with his foster mother, and that foster mother has raised Child and cared for him for years while Mother failed to take the steps necessary to achieve reunification. Admittedly, there also is significant evidence in the record indicating that Mother and Child are bonded. For example, a majority of Mother's visitation progress reports from September of 2012 through May of 2013 indicate that Mother and Child "seem to have a strong bond." CYS Exhibit 7, at 6, 9, 12, 19, 22, 32, 38 (unpaginated). However, Mother admitted that Child "didn't really want to be near me" when she visited him in the hospital in November of 2013. N.T., 7/18/14, at 24. Even if Mother and Child still are bonded, that bond is outweighed in the instant matter by Mother's inability to remedy the causes of Child's placement, and by Child's need for permanence and stability. *See T.D.*, 949 A.2d at 920-23; *J.M.*, 991 A.2d at 325 (quoting *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006) ("'The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a

parent's claims of progress and hope for the future.'")). Mother is not entitled to relief.[8]

Mother's second issue is that her parental rights should not have been terminated because CYS failed to provide reasonable reunification services. Mother's Brief at 16. Mother contends that CYS was obligated to continue providing her services, but "gave up on her much too early." *Id.*

Mother's issue fails, as it is clear that CYS provided her reasonable reunification services. During the June 12, 2013 goal change hearing, Ms. Smith explained that CYS, *inter alia*, referred Mother to a visitation program, to parenting classes, and for both a psychological and psychiatric evaluation. N.T., 6/12/14, at 6. After Mother was discharged unsuccessfully from therapy at Northwestern Human Services, CYS referred Mother for therapy at two new locations. *Id.* at 75-76; CYS Exhibit 1, at 14. In addition, while Mother's visits with Child stopped as result of her failure to contact CYS following her release from incarceration, Mother was permitted to resume visitation at CYS in February of 2014. CYS Exhibit 1, at 16; CYS Exhibit 7, at 1 (unpaginated).

_____

[8] In connection with her other arguments, Mother also emphasizes the portion of Section 2511(b) indicating that "[t]he rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S.A. § 2511(b); Mother's Brief at 12. We note that this provision does not apply to the instant matter, as Mother's parental rights were terminated due to a combination of factors, including her mental instability and unwillingness to work with CYS, and not "solely on the basis of environmental factors" like Mother's unstable housing.

Even if CYS had failed to provide reasonable services, Mother still would not be entitled to relief. In *In re D.C.D.*, 105 A.3d 662 (Pa. 2014), our Supreme Court analyzed the language of Section 2511(a)(2) of the Adoption Act, as well as Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351. The Court reasoned that, while "reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child," neither of these provisions, when read together or individually, requires reasonable efforts. *Id.* at 671-75 (citation omitted). The Court also concluded that reasonable efforts were not required to protect a parent's constitutional right to the care, custody, and control of his or her child. *Id.* at 676-77. While the Supreme Court in *D.C.D.* focused its analysis on Section 2511(a)(2), we find the Supreme Court's reasoning equally applicable to Section 2511(a)(8). Like Section 2511(a)(2), nothing in the language of Section 2511(a)(8) suggests that reasonable reunification services are necessary to support the termination of parental rights.

In her third issue, Mother challenges the constitutionality of Section 2511(b) of the Adoption Act. Mother's Brief at 17-18. Mother focuses her challenge on the third sentence of Section 2511(b), which provides that, "With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." *Id.*; 23 Pa.C.S.A. § 2511(b).

- 17 -

According to Mother, this provision provided CYS an unfair advantage during her termination hearing, as it prohibited Mother from presenting witnesses who would testify concerning her remedial actions taken after the filing of the termination petition, while permitting CYS to present its own evidence of Mother's ongoing parental incompetence. Mother's Brief at 17. Mother suggests that this unfair advantage is a violation of her due process and equal protection rights under the United States and Pennsylvania Constitutions. *Id.* at 17-18.[9] Specifically, Mother emphasizes the lengthy delay between the filing of the petition to terminate her parental rights and her termination hearing, and argues that there is no compelling state interest in preventing the court from considering current information concerning her abilities as a parent. *Id.* at 17. Mother also suggests that CYS should not have been permitted to present its own post-filing evidence, "under fairness and equity doctrines[.]" *Id.* at 17-18.

Again, we conclude that Mother is not entitled to relief. In *D.C.D.*, our Supreme Court rejected the suggestion that Section 2511 violates due process principles. The Supreme Court offered the following discussion.

---

[9] To the extent Mother argues that the Pennsylvania Constitution provides her with greater protection under these circumstances than the United States Constitution, she cites no authority in support of this proposition, and we decline to consider this argument. *See In re F.C. III,* 2 A.3d 1201, 1212 (Pa. 2010) (concluding that the appellant's due process rights were equal under the United States and Pennsylvania Constitutions, where the appellant failed to cite to the Pennsylvania Constitution or offer any argument to the contrary).

As we have previously held, the right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental rights protected by the Due Process Clause [of the Fourteenth Amendment to the United States Constitution]. Accordingly, any infringement of that right by the state must be reviewed by this Court pursuant to a strict scrutiny analysis, determining whether the infringement is narrowly tailored to effectuate a compelling state interest.

Obviously, termination of parental rights is the most extreme infringement of parental rights. **Additionally, it is beyond cavil that the protection of children, and in particular the need to provide permanency for dependent children, is a compelling state interest.** In balancing these interests, the General Assembly has created a detailed system setting forth the limited situations which would result in removal of children from their parents and termination of parental rights. Moreover, the statutory construct requires specific determinations by the trial court regarding the proper placement and permanency goals of the children at each step of the process. Ultimately, the grounds of termination must be demonstrated by the state by clear and convincing evidence. We conclude that this system is sufficiently narrowly tailored to protect a parent's fundamental right while also ensuring the safety and permanency needs of dependent children.

*In re D.C.D.*, 105 A.3d at 676-77 (quotation marks and citations omitted) (emphasis added).

Further, we disagree with Mother's contention that the relevant portion of Section 2511(b) does not serve a compelling state interest. The subject provision furthers the compelling state interest of providing dependent children with permanency, as it prevents unwilling or incapable parents, like Mother, from continuing to delay the adoption of their children with last-minute attempts at reunification.

Mother's claim that Section 2511(b) violates her right to equal protection also fails. "'The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly.'" *Markovsky v. Crown Cork & Seal Co.*, 107 A.3d 749, 766 (Pa. Super. 2014) (quoting *Curtis v. Kline*, 666 A.2d 265, 267 (Pa. 1995)). Here, in the context of a termination of parental rights proceeding, Mother and CYS clearly are not "like persons in like circumstances." Thus, Mother's argument with respect to Section 2511(b) fails to implicate equal protection principles.

Finally, Mother contends in connection with her other constitutional arguments that she did not receive the benefit of a "full" termination hearing, because CYS did not present any live testimony and instead relied solely on documentary evidence. Mother's Brief at 18. Mother concedes that her trial counsel stipulated to the admission of the CYS documentary evidence, and that counsel indicated during the hearing that Mother also was in agreement with this arrangement, but notes that the court did not colloquy Mother and suggests that "it is not clear from the record that [M]other agreed to this voluntarily, knowingly[,] and intelligently." *Id.* Mother states that her fragile mental health prevented her from challenging her trial counsel's stipulations, and the orphans' court "should have mandated a full hearing to better protect her interests and the clear due

- 20 -

process that should have been afforded in such an important termination proceeding." *Id.*

Tellingly, Mother does not direct our attention to any authority indicating that the orphans' court had a duty to colloquy Mother, or to *sua sponte* refuse to accept her trial counsel's stipulations, based on Mother's questionable mental health. We see no basis on which to reverse the orphans' court's decree.

Accordingly, because we conclude that none of Mother's arguments entitles her to relief, we affirm the decree of the orphans' court.

Decree affirmed.

Judge Platt joins the opinion.

President Judge Gantman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/15/2015

- 21 -